IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| European Pensions Management Limited, | : | |
| | : | Case No. 1:16-cv-542 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting Motion to Exclude, |
| Columbus Life Insurance Company, | : | Motion to Strike, and Motion for |
| | : | Summary Judgment |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 25),

Motion to Exclude the Report and Testimony of Richard Mintzer (Doc. 28), and Motion to Strike

the Errata Sheet (Doc. 29). Plaintiff European Pensions Management Limited ("EPM"), the

owner of a lapsed life insurance policy originally issued to Harry Harrison, a now-deceased

third-party, filed suit for breach of contract and bad faith against Defendant Columbus Life

Insurance Company ("Columbus Life"), the issuer of the lapsed life insurance policy. EPM has

abandoned its claim that Columbus Life wrongfully terminated the insurance policy for late

payment, but it alleges that Columbus Life wrongfully refused to reinstate the insurance policy

despite Harrison's failing health.

In the latter two motions, Columbus Life seeks to exclude the Expert Report and

testimony of Richard Mintzer, EPM's purported expert witness, and to strike the errata sheet

proffered by EPM for the deposition of Francis Moore, EPM's Federal Rule of Civil Procedure

30(b)(6) witness. The Court will **GRANT** both motions for the reasons that follow. Likewise,

the Court will **GRANT** summary judgment to Columbus Life because it was not obligated to

reinstate the policy.

## I.    BACKGROUND

The factual history is derived from Columbus Life's Statement of Proposed Undisputed Facts (Doc. 25-1) and EPM's Response thereto (Doc. 27 at PageID 972–1021), plus EPM's Proposed Disputed Issues of Fact (Doc. 27 at PageID 1022–28) and Columbus Life's Responses thereto (Doc. 30-3), unless specifically noted otherwise.  Pursuant to the Court's Standing Order, proposed factual statements properly supported with record evidence and not specifically denied by the opposing party are deemed admitted.

### A.    The Policy

Columbus Life issued a Flexible Premium Universal Life Insurance Policy No. CM5015628U ("the Policy") to Harry Harrison, the insured and original owner of the Policy, effective February 2, 2005.  (Doc. 24-1 at PageID 568.)  The Policy provided a $1,000,000 benefit upon the death of Harrison.  (*Id.*)  It listed a planned premium of $44,251 annually and a five-year no-lapse guarantee minimum monthly premium of $2,793.  (*Id.*)  Harrison was age 76 at the inception of the Policy.  (*Id.*)  Columbus Life knew when it issued the Policy that Harrison had a pacemaker inserted in July 2000 and had been diagnosed with mild chronic obstructive pulmonary disease.  (Wolf Dec. at PageID 819; Doc. 22-1 at PageID 188.)[1]  Nonetheless, Columbus Life assigned Harrison a "standard (non-tobacco user)" mortality class rating—a rating that meant that Columbus Life determined that Harrison "was at no greater risk of dying than the average person."  (Doc. 24-1 at PageID 568; Wolf Dec., Doc. 25-3 at PageID 818.) Columbus Life's mortality class ratings range from "preferred, to standard, to several degrees of substandard, and ultimately to uninsurable."  (Wolf Dec., Doc. 25-3 at PageID 817.)

---

[1]  Aaron Wolf is the Chief Underwriter for Western and Southern Financial Group, Columbus Life's parent company.  (Doc. 25-3 at PageID 817.)

The Policy provided for a sixty-one day "Grace Period" if the owner failed to pay sufficient premiums to maintain coverage, and it lapsed if the premium payment was not made during the Grace Period. The Policy stated, "[i]f You do not pay or mail the needed premium within the 61-day Grace Period, all coverage provided by this policy will terminate without value at the end of the 61-day period." (Doc. 24-1 at PageID 582.) Payments mailed were considered paid on the postmarked date. (*Id.*) The Policy did not provide extensions for nor address in any manner payment deadlines that fell on weekends or holidays. Upon termination of the Policy for non-payment, the Policy allowed for the policy owner to apply for reinstatement:

> If the Grace Period expires and Your policy terminates because You have not paid the needed premium, You may apply to reinstate the policy within five years after the expiration of the Grace Period if the Insured is still living. *The reinstatement is subject to evidence of insurability satisfactory to [Columbus Life].*

(*Id.* (emphasis added).)

**B.      The Policy Transferred and Lapsed**

Ownership of the Policy has transferred two times after it was issued to Harrison. Harrison sold the Policy to an individual named Ian Dike in 2007, and Dike sold it to EPM, a British pension management scheme, in 2009. The Policy entered the Grace Period five times during the three years EPM owned the Policy.

Most relevantly, EPM failed to make a sufficient premium payment due on April 2, 2012. Columbus Life sent EPM a written Grace Period Notice dated April 2, 2012 stating that a payment of $8,048.37 was due by June 2, 2012 "[i]n order to maintain your insurance coverage" or "your policy will terminate at the end of the Grace Period without value." (Doc. 24-1 at PageID 662.) The Grace Period Notice also informed EPM of its right to seek reinstatement if the Policy lapsed:

3

If your policy lapses, you may later apply to reinstate it. In order to reinstate, you will need to provide evidence of insurability and pay all post-due charges as specified in your policy.

(*Id.*) EPM did not make the payment required by June 2, 2012, and the Policy lapsed by its terms. June 2 and 3, 2012 were weekend days and June 4 and 5, 2012 were bank holidays in the United Kingdom. EPM wired payment to Columbus Life on June 6, 2012.

On June 7, 2012, Columbus Life sent EPM a written Notice of Loss of Coverage explaining that the Policy had lapsed. (*Id.* at PageID 664.) The Notice of Loss of Coverage stated as follows regarding reinstatement:

> THIS COVERAGE MAY BE REINSTATED, WITHIN THS NEXT FIVE (5) YEARS, IF
> • You provide proof of insurability to our underwriters, AND
> • You pay an amount that would make the Net Cash Surrender Value sufficient to pay back costs and charges as specified in your policy contract, AND
> • You pay an amount sufficient to cover the monthly policy charges for 3 months after reinstatement, AND
> • You repay or reinstate any loan and interest indebtedness that existed at the time the policy lapsed.

(*Id.*) The next day, Columbus Life sent EPM a letter regarding the lapse and included as attachments (1) a check to EPM for the value of the late premium payment EPM had wired to Columbus Life and (2) a blank application for reinstatement. (*Id.* at PageID 665–66.)

## C.     Application for Policy Reinstatement Denied

On July 19, 2012, EPM submitted by electronic mail a Reinstatement Application signed by Harrison on June 26, 2012. (*Id.* at PageID 690–96.) Harrison had been diagnosed with Parkinson's disease, dementia, peripheral vascular disease, and chronic kidney disease before he signed the Reinstatement Application. However, he answered questions on the Reinstatement Application about adverse medical conditions in the negative. (*Id.* at PageID 695.) Columbus Life then asked an agent named Doug Bailey to assist EPM and Harrison with the reinstatement

process.  (Doc. 30-3 at PageID 1135–36.)  Columbus Life determined during its subsequent investigation that Harrison no longer qualified for a standard mortality class rating.  (Wolf Dep., Doc. 22 at PageID 147–48.)  Columbus Life will not grant an application for reinstatement unless the insured qualifies for the same mortality class rating at the time of reinstatement that he or she qualified for when the policy was first issued.  (Wolf Dec., Doc. 25-3 at PageID 817.)  In August 2012, Columbus Life declined to reinstate the Policy insuring Harrison "due to overall medical history which includes pacemaker, Parkinson's disease, peripheral vascular disease, and chronic kidney disease."  (Doc. 22-1 at PageID 215–16.)  Columbus Life re-stated the denial in a December 14, 2012 letter based on the "overall current medical history" of Harrison.  (*Id.* at PageID 217–19.)

On July 22, 2013, Harry Harrison died at the age of 85.

**D.     Procedural History**

EPM filed this suit against Columbus Life on May 12, 2016 alleging that Columbus Life breached the Policy and acted in bad faith first by terminating the Policy and then by refusing to grant the Reinstatement Application.  Following discovery, Columbus Life moved for summary judgment as to both the claims for wrongful termination of the Policy and for wrongful refusal to reinstate the Policy.  It argues that (1) it did not breach the Policy or act in bad faith when it terminated the Policy because EPM failed to make the premium payment before expiration of the Grace Period; (2) it did not breach the Policy or act in bad faith when it denied reinstatement because EPM did not provide satisfactory evidence of Harrison's insurability.  Significant to the analysis below, EPM argues in rebuttal only that there are genuine issues of material fact in dispute whether Columbus Life breached the Policy and acted in bad faith when it refused to reinstate the Policy.  (Doc. 26.)  EPM does not challenge Columbus Life's initial decision to

terminate the Policy for non-payment, and the Court considers EPM to have withdrawn its breach of contract and bad faith claims based upon the termination of the Policy.

EPM relies on the testimony of Richard Mintzer, its purported expert witness, and Francis Moore, its Rule 30(b)(6) corporate representative, to support its opposition to the summary judgment motion. Columbus Life, however, moves to exclude the Expert Report and deposition testimony of Mintzer and to strike the errata sheet proffered by EPM to correct Moore's response to one deposition question. The Court will resolve the Mintzer and Moore testimony issues before addressing the summary judgment motions.

## II.    MOTION TO EXCLUDE REPORT AND TESTIMONY

Columbus Life moves to exclude the Expert Report (Doc. 23-1 at PageID 427–34) and deposition testimony (Doc. 23) of Mintzer. Mintzer is an insurance industry professional with forty years of experience. (Doc. 23-1 at PageID 379–81.) He helped clients secure several hundred life insurance policies during his career, but he never acted as a life insurance or medical underwriter. (Mintzer Dep., Doc. 23 at PageID 259–61, 335.) Mintzer has no specific education, training, or experience in how life insurance companies process premium payments or reinstatement applications. (*Id.* at PageID 269, 271–73.) He has served as an expert witness regarding insurance issues on behalf of both plaintiffs and defendants in more than one hundred cases. (Doc. 23-1 at PageID 383–99.)

Mintzer stated the following opinions in his Expert Report:

(1)  The final due date for payment of the premium on the Policy following the sixty-one day Grace Period was June 6, 2012 because Columbus Life should have applied the generally-accepted "weekend and legal holiday rule." (Doc. 23-1 at PageID 428–29.)

(2)  The phrase "evidence of insurability satisfactory to [Columbus Life]" in the reinstatement provision of the Policy is ambiguous. (*Id.* at PageID 430.)

6

(3)  Columbus Life turned down Harrison's Reinstatement Application because of his age, not because of his health.  (*Id.* at PageID 431–32.)

(4)  Columbus Life applied unreasonably strict underwriting standards, acted in its own self-interest, and acted without good faith when it denied the Reinstatement Application.  (*Id.* at PageID 432–34.)

Columbus Life moves to exclude the Expert Report and deposition testimony for failure to comply with the standards of Federal Rule of Civil Procedure 26(a)(2)(B) and Federal Rule of Evidence 702.

**A.  Standards of Law for Expert Testimony**

Federal Rule of Civil Procedure 26(a)(2)(B) requires a testifying expert witness to provide a written report to the other parties with the following disclosures:  (i) his opinions and the bases therefore, (ii) the facts or data he considered, (iii) the exhibits he will use, (iv) his qualifications, including a list of his publications from the previous ten years, (v) a list of the cases in which he testified in the previous four years, and (vi) his compensation for serving as an expert witness.  *Id.*  Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."

Federal Rule of Evidence 702 addresses the admissibility of expert witness testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the
> case.

Fed. R. Evid. 702. "A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence 'both rests on a reliable foundation and is relevant to the task at hand.'" *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993)). The district court acts as a "gatekeeper" in making these determinations and must evaluate relevancy and reliability with "heightened care." *U.S. v. Cunningham*, 679 F.3d 355, 380 (6th Cir. 2012) (citation omitted). The district court must perform its gatekeeper function before the testimony can be admitted regardless of whether the testimony is based on scientific knowledge, technical knowledge, or other specialized knowledge. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 147–49 (1999); *Mike's Train House, Inc. v. Lionel, L.L.C.*, 472 F.3d 398, 407 (6th Cir. 2006).

The Sixth Circuit notes that "rejection of expert testimony is the exception, rather than the rule." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) (citation omitted). As such, "Rule 702 should be broadly interpreted on the basis of whether the use of expert testimony will assist the trier of fact." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 516 (6th Cir. 1998) (citation omitted). The trial court's role as a gatekeeper of expert testimony is not meant to serve as a replacement of the adversary system. *See Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 377 (6th Cir. 2014) (citation omitted).

As to reliability, the Supreme Court in *Daubert* identified several factors which might bear on a reliability determination: testing, peer review, publication, known or potential rate of error, and general acceptance. 509 U.S. at 593–94. The *Daubert* factors are neither definitive nor exhaustive and may not apply in every case. *Mike's Train House*, 472 F.3d at 407. "Red

flags that caution against certifying an expert include reliance on anecdotal evidence, improper

extrapolation, failure to consider other possible causes, lack of testing, and subjectivity." *Newell*

*Rubbermaid*, 676 F.3d at 527. However, an evaluation of the reliability of an expert opinion

does not involve a determination of whether the opinion is correct. *In re Scrap Metal*, 527 F.3d

at 529–30; *GED Integrated Solutions, Inc. v. Durotech Int'l, Inc.*, No. 5:06CV1327, 2009 WL

233872, at *4 (N.D. Ohio Jan. 30, 2009) (citing *In re Scrap Metal*).

In certain cases, an expert's experience alone may provide a reliable basis for his

testimony. Fed. R. Evid. 702 (2000 Amendments advisory committee notes); *see also Campbell*

*v. City of Springboro, Ohio*, 788 F. Supp. 2d 637, 662 (S.D. Ohio 2011) (stating that reliability

concerns may focus on personal knowledge and experience). "If the witness is relying solely or

primarily on experience, then the witness must explain how that experience leads to the

conclusion reached, why that experience is a sufficient basis for the opinion, and how that

experience is reliably applied to the facts." Fed. R. Evid. 702 (2000 Amendments advisory

committee notes); *see also Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296

(6th Cir. 2007) (quoting the advisory committee notes).

Rule 702 "does not require anything approaching absolute certainty." *Tamraz v. Lincoln*

*Elec. Co.*, 620 F.3d 665, 671 (6th Cir. 2010). However, an expert's opinion must amount to

more than mere speculation. *Id.* The Sixth Circuit has excluded an expert's opinion when it was

based upon a "string" of speculations:

> And where one person sees speculation, we acknowledge, another may see
> knowledge, which is why the district court enjoys broad discretion over where to
> draw the line. Yet, so long as there is a line, some forms of testimony may cross
> it, and that happened here. [The expert's] opinion contains not just one
> speculation but a string of them: A suggests by analogy the possibility of B,
> which might also apply to C, which, if we speculate about D, could eventually

trigger E, so perhaps that happened here.  At some point, the train becomes too long to pull and the couplings too weak to hold the cars together.

*Id.* at 672 (internal citation omitted).

**B.    Analysis**

**1.    Sufficiency of Rule 26(a)(2)(B) Disclosures**

To begin, Columbus Life argues that Mintzer failed to meet the disclosure requirements of Rule 26(a)(2)(B).  For example, Mintzer initially failed to disclose in the Expert Report a list of nineteen articles he had written in the past ten years in violation of Rule 26(a)(2)(B)(iv).  (Mintzer Dep., Doc. 23 at PageID 279–85; Doc. 23-1 at PageID 414.)  However, EPM provided Columbus Life with these materials before or during Mintzer's deposition.  Columbus Life also argues that Mintzer admitted during his deposition that he failed to disclose the names of at least two cases in which his proffered expert testimony was excluded by a court.  (Mintzer Dep., Doc. 23 at PageID 278–79.)  However, it is not clear that this was a violation of Rule 26(a)(2)(B)(v) because Mintzer only had to disclose cases in which he testified during the previous four years.  Mintzer was not asked when he testified in one non-disclosed case, but stated that it was "many years ago[,]" (*Id.* at PageID 278), and his testimony was excluded in the other case in 2001, more than four years earlier, *Epis, Inc. v. Fid. & Guar. Life Ins. Co.*, 156 F. Supp. 2d 116, 1124 (N.D. Cal. 2001).  Regardless, the Court will not strike Mintzer's Expert Report for his failure to disclose publications or case names because Columbus Life does not appear to have been harmed by the omissions.

More troubling is Mintzer's failure to fully and accurately disclose the bases for his opinions as required by Rule 26(a)(2)(B)(i) and (ii).  Mintzer stated broadly that he reviewed relevant Policy information, other insurance companies' reinstatement policies, law review

10

articles, and the college text book, *Planning for Business Owners and Professionals*. Mintzer cited an American International Group ("AIG") reinstatement guide to support his deposition testimony that different insurance companies have different underwriting standards for reinstatement applications. (Mintzer Dep., Doc. 23 at PageID 246–47.) He further testified that he "think[s]" he looked at other insurance guides too, but he did not "remember what they were." (*Id.* at PageID 246.) Mintzer's testimony is problematic. To begin, this opinion offered by Mintzer at the deposition—that different companies have different underwriting standards for reinsurance application—is improper because Mintzer did not first state the opinion in his Expert Report. (Doc. 23-1 at PageID 427–34.) Also, Mintzer's failure to identify the other company policies he examined, if any, impaired Columbus Life's ability to effectively cross-examine Mintzer about how the policies of other insurance policies impacted his interpretation of the Policy issued by Columbus Life to Harrison.

Mintzer also testified at his deposition that he relied upon a law review article from the William and Mary Law Review published in 1965. (Mintzer Dep., Doc. 23 at PageID 241.) He failed to properly identify the law review article in the Expert Report as the basis for his opinions. (Doc. 23-1 at PageID 435–37.) Additionally, he testified that the insurance industry has changed "[v]ery substantially" since 1965, including that the rights of reinstatement are more heavily regulated. (Mintzer Dep., Doc. 23 at PageID 243.) Therefore, Mintzer did not establish that the principle he cites from the law review article is still applicable today.

Similarly, Mintzer failed to cite in the Expert Report the *Planning for Business Owners and Professionals* textbook that he identified at deposition. (Doc. 23-1 at PageID 363–70, 435–37.) Moreover, the chapter 3 heading and page number of the pages he cites as being from the *Planning for Business Owner and Professionals* textbook do not match the chapter 3 heading or

page numbers for that book on its table of contents.  (*Compare Id.* at PageID 363–65 *with* PageID 367.)  The Court concludes that the text excerpt does not, in fact, come from the *Planning for Business Owner and Professionals* textbook despite Mintzer's mistaken testimony.

Finally, Mintzer stated in the Expert Report that "[i]nsurance rates and actuarial statistics recognize the fact that a certain percentage of insureds will give up their policy benefits when they no longer need or want to continue paying insurance premiums."  (Doc. 23-1 at PageID 432.)  However, he admitted at his deposition that he did not look at any specific actuarial statistics, but instead he knew from his "personal experience there are mortality table and actuarial tables that take into account the fact that a certain percentage of policy owners will give up their policies prior to paying a death benefit."  (Doc. 23 at PageID 329.)  Mintzer again here fails to meet the basic Rule 26(a)(2)(b) requirement to state the bases for his opinions and provide the facts and data relied upon.

In sum, Mintzer failed to completely and accurately disclose the "how" and the "why" of his Expert Report opinions rendering his opinions unreliable and causing prejudice to Columbus Life.  *See R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (interpreting requirements of Rule 26); *Baker v. Chevron USA, Inc.*, 680 F. Supp. 2d 865, 879 (S.D. Ohio 2010) (on per se prejudice).  The report itself "must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources."  *R.C. Olmstead*, 606 F.3d at 271 (citation omitted).  The failure to comply with Rule 26(a)(2)(B) is sufficient grounds to strike Mintzer's testimony pursuant to Rule 37(c)(1).  Nonetheless, the Court will proceed to analyze whether Mintzer's substantive opinions otherwise would be admissible.

## 2. Admissibility of Opinions Under Rule 702

### a. First Opinion: The final due date for payment of the premium on the Policy following the sixty-one day Grace Period was June 6, 2012 because Columbus Life should have applied the generally-accepted "weekend and legal holiday rule."

Mintzer opined that Columbus Life should have applied a "weekend and holiday rule" and determined that the Grace Period ended on June 6, 2012. (Doc. 23-1 at PageID 428–29.) This opinion by Mintzer primarily is relevant to EPM's now-abandoned claim that Columbus Life violated the Policy and acted in bad faith when it terminated the Policy for non-payment of the premium on June 2, 2012. Mintzer supported this opinion in the Expert Report merely by making the conclusory assertion that "[i]t is a generally accepted insurance industry standard that if the due date of the invoice falls on a Saturday, Sunday, or legal holiday the premium is not due until the next business day." (Doc. 23-1 at PageID 429.) This is not sufficient. Expert reports must contain the "how" and the "why" the expert arrived at each conclusion. *R.C. Olmstead*, 606 F.3d at 271.

At his deposition, Mintzer supported this opinion by referencing his experience in the insurance field, specifically stating that the five life insurance companies he worked for applied a weekend and holiday rule. (Mintzer Dep., Doc. 23 at PageID 299.) However, he admitted that the Policy issued by Columbus Life to Harrison did not provide any exceptions for payment due dates landing on a weekend or holiday. (*Id.* at PageID 300, 302.) "[A]s to insurance coverage issues where the parties' rights are 'governed by the written contract between them, any evidence concerning the custom of the insurance industry with regard to matters covered in the contract' is 'irrelevant,' and a trial court does not err by refusing to admit expert testimony on such industry practices." *The Way Int'l v. Exec. Risk Indem., Inc.*, No. 3:07CV294, 2009 WL 3157402, at *14

13

(S.D. Ohio Jan. 27, 2009), *report and recommendation adopted*, 2009 WL 3157403 (S.D. Ohio

Sept. 28, 2009) (quoting *City of Warrensville Hts. v. City of Shaker Hts.*, No. 38356, 1979 WL

209954, at *6 (Ohio App. 8th Dist. Mar. 15, 1979)).

Moreover, Mintzer gave inconsistent testimony regarding whether Columbus Life was

*legally required* to follow the weekend and legal holiday rule or whether it simply acted contrary

to a customary practice of insurance companies:

> A.  I believe that the holiday weekend -- holiday -- weekend and holiday rules
> that are a common practice in United States should apply to legal holidays in
> England.
>
> Q.  Okay. What are the weekend and holiday rules that you're referring to?
>
> A.  That if a premium falls due on a weekend or a holiday, it's not due until
> the next business day.
>
> *Q.  Is that a legal rule?*
>
> *A.  I don't know the answer to that question.*
>
> Q.  Do you know if insurance companies are required to do that?
>
> A.  I know that some states have statutes regarding that, but I can't -- cannot
> comment specifically on Ohio or -- actually, I can comment specifically.  I do
> know that some states have statutes regarding this.
>
> * * * *
>
> A.  What I'm suggesting -- I don't know why we're -- keep going over this
> thing.  *What I'm suggesting, in my opinion, if a policy lapses on June 2nd and
> that happens to be a weekend or a holiday, it's not due until the next business day.*
> That's what I'm opining to.  I don't know where you're going with all these
> questions, but that's what my opinion is.
>
> *Q.  Is that your opinion regardless of what the policy says?*
>
> *A.  That is my opinion, yes.*
>
> * * * *

14

A.        I'll answer the question again.  I believe that when a company is doing business globally, they have to recognize the local customs and rules of the country that they're doing business in.  That's the simplest way I can put it.

*Q.        Are you aware of any legal requirement that says that?*

*A.        No.*

*Q.        Okay.  So it's just your opinion that they should?*

*A.         Yes.*

Q.        But not that they have to?

A.        They don't have to do anything I guess, but the question is what the practice the actual practice is.

*Q.        Okay.  But that's an important point. It's not your opinion that Columbus Life had to observe any legal holidays in England.*

*A.        No.  I think that they should.  The word is should.*

* * * *

*Q.        Okay.  You agree that the policy governs the premium payments in this case, right?*

*A.        Correct.*

* * * *

THE WITNESS:  If he was not late in his premiums if -- if -- no scratch that.  *In my point of view, he was not late in his premiums because he was not obligated to pay the premium until June 6th because of the holiday and weekend rules.*

*Q.        (By Mr. Hine) Right.  But again, none of that is in the contract, correct?*

*A.        None of that is in the contract.*

*Q.        Okay. So notwithstanding the apparent holiday and weekend rules, you agree -- I think you just testified that -- that EPM was late under the terms of the contract, correct?*

*A.        It's notwithstanding anything.  It's a simple fact.  In my opinion, it was due June 6th.*

Q. Do you agree that the contract said that they had to pay the premium by the end of the grace period?

A. Yes.

Q. Do you agree the end of the grace period was June 2nd, 2012?

A. Yes.

*Q. And do you agree that they did not make a payment by June 2nd, 2012?*

*A. Yes.*

*Q. Okay. But that doesn't matter to you?*

*A. Of course it matters.*

(*Id.* at PageID 299–301, 304, 306 (emphasis added).) Expert witness testimony is only admissible if it is helpful to the trier of fact. Fed. R. Civ. P. 702. Mintnzer's testimony on this issue is too muddled and contradictory to be helpful to the trier of fact on the issue of bad faith. Accordingly, the Court will strike Mintzer's Expert Report and testimony regarding the weekend and holiday rule.

> **b.** **Second Opinion: The phrase "evidence of insurability satisfactory to [Columbus Life]" in the reinstatement provision of the Policy is ambiguous.**

Mintzer opined that the phrase "evidence of insurability satisfactory to [Columbus Life]" is ambiguous. (Doc. 23 at PageID 430.) This determination is not appropriate for a purported expert witness. The interpretation of a contract is a matter of law for the Court. *United Nat'l Ins. Co. v. SST Fitness Corp.*, 182 F.3d 447, 449 (6th Cir. 1999); *Lager v. Miller–Gonzalez*, 120 Ohio St. 3d 47, 896 N.E.2d 666, 669 (2008). The determination of whether a contract term is ambiguous "is not dependent upon any purported expert's ability to interject uncertainty." *The*

*Way Int'l*, 2009 WL 3157402, at *14. Mintzer's second opinion is not helpful to the trier of fact and is not admissible under Rule 702.

### c. Third Opinion: Columbus Life turned down Harrison's Reinstatement Application because of his age, not because of his health.

Mintzer opined that Columbus Life did not base its decision to deny reinstatement of the Policy on Harrison's health, but on his age. (Doc. 23-1 at PageID 431–32.) Mintzer acknowledged in the Expert Report that Harrison's health had declined over seven years such that Harrison went from being evaluated as the standard mortality class rating to a sub-standard rating, but he dismissed Harrison's health as the actual reason reinstatement was declined. (*Id.* at PageID 431.) Mintzer stated that Columbus Life had the option to issue life insurance policies at the lower sub-standard rating. (*Id.*) He then concluded, seemingly out of proverbial left field, that Columbus Life denied reinstatement based on Harrison's age.

It is notable that Mintzer never states Harrison's age at the time of the inception of the Policy, the date the Policy lapsed, or the date the Reinstatement Application was denied. Of course, the Court and the parties are aware that Harrison was age 76 in 2005 when he purchased the Policy and age 84 when he applied for and was denied reinstatement in 2012. (Doc. 24-1 at PageID 568, 692.) Mintzer's conclusory opinion begs the questions—but does not answer—at what age Columbus Life considered an applicant to be too old to be insured or why Harrison's age of 76 was not a disqualifying factor to Columbus Life in 2005. Mintzer does not cite to or provide any actuarial data concerning life expectancy. He does not provide any facts regarding how Columbus Life or other life insurance companies typically treat an applicant's advancing age in their underwriting decisions.

Additionally, Mintzer undermined his own opinion that Columbus Life denied the Reinstatement Application based on Harrison's age in at least two ways at his deposition. First, Mintzer admitted his opinion was based on speculation when he testified it was not based on any "documents that [he] may or may not have seen" nor upon any "specific evidence." (Doc. 23 at PageID 327.) Second, Mintzer specifically testified that Columbus Life would have reinstated the Policy if Harrison had not had health problems at the time he applied for reinstatement. (*Id.* at PageID 326.) In sum, Mintzer does not provide a reasoned basis in the Expert Report for his opinion that Columbus Life denied the Reinstatement Application based on Harrison's age. The Court concludes that Mintzer's third opinion is neither reliable nor helpful to the trier of fact.

### d. Fourth Opinion: Columbus Life applied unreasonably strict underwriting standards, acted in its own self-interest, and acted without good faith when it denied the Reinstatement Application.

Mintzer opined that Columbus Life did not act in good faith when it applied the most restrictive underwriting standards to the Reinstatement Application. (Doc. 23-1 at PageID 432–34.) It is clear from Mintzer's deposition testimony that his opinion that Columbus Life acted in bad faith is based in part on Columbus Life's decision to consider the Policy lapsed as of June 2, 2012, instead of applying the so-called weekend and holiday rule. (Doc. 23 at PageID 321 (stating he "believe[d] the policy never lapsed"), 332 (stating there never should have been a request for reinstatement because Columbus Life "should have taken the check because of the holiday rule"), 333 (stating that Columbus Life "never should have gotten to the reinstatement request because the policy premium was paid"). EPM, however, has abandoned its claim that Columbus Life wrongfully terminated the Policy based on the non-payment of the premium. It is impossible to determine precisely how much the mistaken assumption that Columbus Life wrongfully terminated the Policy impacted Mintzer's bad faith opinion because he refused to

18

respond to a deposition question asking him to assume that the Policy had lapsed.  (*Id.* at PageID 321.)

Additionally, Mintzer opined that insurance companies typically apply more liberal underwriting standards when an insured applies for reinstatement close in time to the policy lapsing.  He stated as follows in the Expert Report:

> Underwriting standards with regard to reinstatement requests operate on a continuum.  By that, I mean a reinstatement request received a few days after the lapse date is treated differently than a reinstatement request months or years after the policy lapse.  The reason for the difference in underwriting standards is that a person who waits months or years to apply for reinstatement is most likely to have health issues.  However, a person who misses a payment and requests a reinstatement a few days subsequent to the lapse date is generally viewed as a person whose intention is to keep the policy in force.  Therefore, the underwriting decisions must be much more liberal for a person who misses a premium payment by a few days as compared with a few months or few years.  To put it another way, the further out the reinstatement request is from the lapse date the more stringent the underwriting will be.

(Doc. 23-1 at PageID 430.)  Mintzer argued that Columbus Life should have applied a liberal underwriting standard to Harrison's Reinstatement Application because he immediately applied for reinstatement after the Policy lapsed.

Mintzer was not able at his deposition to clearly explain what he meant by the term "liberal underwriting standards."  (Doc. 23 at PageID 321, 331.)  When asked what he meant by more liberal standards, Mintzer responded as follows:

> Q.      (By Mr. Hine) Okay. When you say generally more liberal, what do you mean by that?
>
> A.      I mean, that's a general standard of practice.  Every -- we've already agreed that every insurance company makes up their own rules.  I'm just saying that, generally speaking, on the over -- of the over -- overarching spectrum of the industry, applications for reinstatement at different times and places require and usually request different information.  It's not very complicated.

Q.      Okay. But you say that there -- "The underwriting decisions must be much more liberal for a person who misses a premium payment by a few days as compared with a few months or a few years."

A.      That's what I said, yes.

Q.      How much more liberal?

A.      I can't answer that question.

Q.      How can anyone answer that question?

A.      Well, it's more liberal or less liberal.  It's not a percentage.

(*Id.* at PageID 320–21.)

Additionally, Mintzer's opinion was not well-supported.  At his deposition, Mintzer cited in support of this opinion the textbook excerpt he wrongly asserts as being the *Planning for Business Owners and Professionals* textbook, (Doc. 23-1 at PageID 363 ("However, if the insurer receives the payments required under 2 and 3 above within thirty-one days after expiration of the grace period while the insured is still living, the insurer will usually waive evidence of insurability.")), and the AIG reinstatement guide, (Doc. 23-1 at PageID 371).  Again, neither of these sources was identified in the Expert Report, and the textbook excerpt was misidentified at the deposition.

Next, Mintzer ignored an obvious corollary cutting against EPM's interest that flows from his assumptions.  He stated in the Expert Report that an insured person who waits for "months or years" after a policy lapses to apply for reinstatement is not entitled the same liberal underwriting standards as a person who quickly applies for reinstatement because the person who delays is "most likely to have health issues."  (Doc. 23-1 at PageID 430.)  This statement suggests that the passage of time leads to health problems.  It follows that an insured person like Harrison whose policy lapsed seven years after inception of the Policy also is likely to have

health problems.[2]  By Mintzer's own reasoning, Columbus Life did not have to apply liberal underwriting standards if the reinstatement applicant, like Harrison, has health issues.

Likewise, Mintzer opines that Columbus Life acted in bad faith because it acted in its own self-interest by denying the Reinstatement Application.  (Doc. 23-1 at PageID 432, 434.)  This is a conclusory opinion.  Mintzer testified at the deposition that he knew Columbus Life acted in its own self-interest because he "judge[d] what they [*sic*] did by the results."  (*Id.* at PageID 334.)  He noted that the result of Columbus Life denying the Reinstatement Application was "a big payday by not having to pay a premium benefit."  (*Id.*)  Of course, this argument can be made against any insurer which allows a policy to lapse or denies an application for reinstatement.

Finally, Mintzer's opinion that Columbus Life acted in bad faith was contradicted by his deposition testimony that "the [P]olicy governs the conditions for reinstatement" and that Columbus Life did not violate the "terms of the [P]olicy[.]"  (Mintzer Dep., Doc. 23 at PageID 331.)  Mintzer "never even thought about" whether Columbus Life would have had "potential good faith bases" to deny the Reinstatement Application.  (*Id.* at PageID 334.)  In sum, Mintzer's opinion that Columbus Life was obligated to apply liberal underwriting standards is too vague, conclusory, and contradictory to his other testimony to be helpful to the trier of fact.

## C.    Conclusion

The Court will exclude Richard Mintzer's Expert Report and testimony.

---

[2]  The Court bears in mind that the right to reinstatement lasts only a limited period of time.  For example, Ohio law requires life insurance policies only to provide a right of reinstatement for three years after a policy lapses.  Ohio Rev. Code § 3915.05(J).  The Policy itself provided a five-year reinstatement window.

### III. MOTION TO STRIKE ERRATA SHEET

Columbus Life moves the Court to strike an errata sheet submitted by EPM for the deposition of its Federal Rule of Civil Procedure 30(b)(6) witness, Francis Moore. Moore was deposed on April 12, 2017. (Moore Dep., Doc. 24 at PageID 452.) EPM's attorney states that at the conclusion of the deposition he asked the court reporter to provide the transcript to him and told the reporter he would provide it to Moore for review. (Gebara Dec., Doc. 33 at PageID 1159.)

On May 1, 2017, the court reporting agency sent a copy of the Moore deposition transcript to Columbus Life's attorney pursuant to his transcript order. (Doc. 29-1 at PageID 1063.) The cover letter to the Columbus Life's attorney, which was copied to EPM's attorneys, reminded the attorneys that "the witness ha[d] thirty days to return the errata sheet and signature page" to the agency pursuant to the Federal Rules of Civil Procedure. (*Id.*) EPM's attorney agrees that he was on notice as of May 1, 2017 that the transcript was available. (Gebara Dec., Doc. 33 at PageID 1159.) The court reporting agency provided a copy of the deposition transcript to EPM's attorney on May 30, 2017 after he purchased it. (*Id.*)

On June 27, 2017, EPM submitted an errata sheet for the Moore deposition to the court reporter and to Columbus Life's attorney. (Doc. 29-1 at PageID 1064–66.) Moore purported to change the following one-word answer "Yes" in the deposition transcript to "No" in the errata sheet:

> Q. Okay. So even if you knew there was blatantly false information on this [Reinstatement Application] form, you would not have corrected it or tried to get the correct answer because you didn't believe the form was necessary?
>
> A. Yes.

(Moore Dep., Doc. 24 at PageID 531; Doc. 29-1 at PageID 1065–66.)  Moore also included a four-paragraph explanation for the change beginning that he "misspoke in answer to this question."  (Doc. 29-1 at PageID 1066.)  Columbus Life moves to strike the errata sheet as untimely and substantively improper.

## A.     Standard of Law

The process by which a deponent may alter his deposition testimony is as follows:

(e) Review by the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

Fed. R. Civ. P. 30(e)(1).

## B.     Analysis and Conclusion

The Moore deposition errata sheet violates Rule 30(e) and must be stricken.  First, it is untimely.  In conformance with EPM's request at the deposition, Moore was provided with constructive notice that the transcript was available when such notice was provided to EPM's attorney on May 1, 2017.  It was EPM's burden to obtain a copy of the transcript and submit an errata sheet within thirty days pursuant to Rule 30(e)(1).  EPM did not submit the errata sheet until almost two months had passed.  The errata sheet will be stricken on this basis.  *See*, *e.g.*, *Kull v. Village of Yorkville, Ohio*, No. 2:07-cv-686, 2008 WL 5188167, at *4–5 (S.D. Ohio Dec. 10, 2008) (striking untimely errata sheets as failing to meet the procedural requirements of the

Rule 30(e)); *U.S. v. United Techs. Corp.*, No. 3:99-cv-093, 2004 WL 5626494, at *2 (S.D. Ohio Oct. 11, 2004) (striking errata sheet submitted several months after the Rule 30(e) deadline).

Second, EPM improperly tried to make a substantive change to Moore's testimony through the errata sheet. Despite reference to "changes in either form or substance," the Sixth Circuit takes a "restrictive approach" toward Rule 30(e). *See Mullins v. Cyranek,* No. 1:12CV384, 2014 WL 3573498, at *2 (S.D. Ohio July 21, 2014) (collecting cases). The Sixth Circuit has stated that "Rule 30(e) does not allow one to alter what was said under oath." *Trout v. FirstEnergy Generation Corp.,* 339 F. App'x 560, 565 (6th Cir. 2009) (citation omitted). It is "the '[o]ne court of appeals [that] permits a deponent to correct *only* typographic and transcription errors." *Walker v. 9912 East Grand River Assocs., LP,* No. 11-12085, 2012 WL 1110005, at *3 (E.D. Mich. Apr. 3, 2012) (quoting *Devon Energy Corp. v. Westacott,* No. H-09-1689, 2011WL1157334, at *5 (S.D. Tex. Mar. 24, 2011)) (emphasis added); *see also Giebel v. Lavalley*, No. 5:12-cv-750, 2013 WL 6903784, at *4 (N.D. Ohio Dec. 31, 2013) ("[I]t is irrelevant whether the additional testimony is consistent or inconsistent with prior testimony: the only acceptable changes are those that correct either typographical or transcription errors").[3] In the errata sheet, Moore asserted that he "misspoke" and he attempts to change a one-word deposition answer and supplement it with a four-paragraph explanation. (Doc. 29-1 at PageID 1065–66.) This amounts to improper attempt to change the substance of Moore's testimony. Columbus Life would be prejudiced if Moore were permitted to alter his deposition testimony because it did not have an opportunity to cross-examine Moore regarding this new answer and

_____

[3] *But see Jermano v. Graco Children's Prods.*, No. 13-cv-10610, 2015 WL 1737548 (E.D. Mich. Apr. 16, 2015) (stating that "it is not crystal clear in this Circuit that a deponent cannot make substantive changes to his deposition testimony under Rule 30(e)").

explanation.  Accordingly, the Court will strike the errata sheet to Francis Moore's deposition as untimely and an improper attempt to change the substance of deposition testimony.

## IV.     MOTION FOR SUMMARY JUDGMENT

Columbus Life moves for summary judgment, as a matter of law, on the grounds that it neither breached the Policy nor acted in bad faith when it refused to reinstate the Policy.  The Policy stated that "reinstatement is subject to evidence of insurability satisfactory to [Columbus Life]."  (Doc. 24-1 at PageID 582.)  Columbus Life argues that it did not receive satisfactory evidence of insurability because although Harrison did not disclose any health problems on the Reinstatement Application, Columbus Life discovered in its subsequent investigation that Harrison was suffering from Parkinson's disease, dementia, chronic kidney disease, and peripheral vascular disease.  In rebuttal, EPM argues that the phrase "evidence insurability satisfactory to [Columbus Life]" is ambiguous and must be interpreted in its favor.  EPM argues that there is at least a genuine dispute of fact whether Harrison was insurable at a substandard mortality class rating, and therefore, whether Columbus Life breached the contract and acted in bad faith when it denied reinstatement.  EPM concedes that its bad faith claim is contingent upon a finding that Columbus Life breached the terms of the Policy.  (Doc. 26 at PageID 968.)

### A.     Standards of Law

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to show that no genuine issues of material fact are in dispute.  *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).  The movant may support a motion for summary judgment with

affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**B.     Analysis and Conclusion**

The Court begins its analysis with a review of contract interpretation principles. Under Ohio law, the interpretation of an insurance contract is a question of law. *United Nat'l Ins. Co.*, 182 F.3d at 449; *Lager*, 896 N.E.2d at 669. "Where the language of the contract is clear and unambiguous, any extrinsic evidence should be excluded and the court should look only to the

four corners of the written contract to determine the plain and ordinary meaning of the terms it contains." *Haemmerle v. Franklin Life Ins. Co.*, 25 F. App'x 359, 361 (6th Cir. 2002); *see also United Nat'l Ins. Co.,* 182 F.3d at 449–50 ("Words and phrases used in an insurance policy must be given their natural and commonly accepted meaning.'") (quoting *U.S. Fidelity & Guar. Co. v. Lightning Rod Mut. Ins. Co.*, 80 Ohio St. 3d 584, 687 N.E.2d 717, 719 (1997)).  "The mere absence of a definition in an insurance contract does not make the meaning of [a] term ambiguous" if the term has a "plain and ordinary meaning."  *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St. 3d 107, 652 N.E.2d 684, 686 (1995).  "To ascertain the common meanings of terms or phrases not defined in the language of contracts, Ohio courts routinely turn to dictionaries."  *Textileather Corp. v. GenCorp Inc.*, 697 F.3d 378, 382 (6th Cir. 2012).  When contract provisions are susceptible to more than one meaning, "they must be construed strictly against the insurer and liberally in favor of the insured."  *Schwartz Manes Ruby and Slovin, L.P.A. v. Monitor Liab. Managers, LLC,* 483 F. App'x 241, 244 (6th Cir. 2012) (citing *Westfield Ins. Co. v. Hunter*, 128 Ohio St. 3d 540, 948 N.E.2d 931, 935 (2011)).

The core of the parties' dispute is whether the phrase "evidence of insurability satisfactory to [Columbus Life]" is ambiguous or has a plain and ordinary meaning.  The Policy did not explicitly define the term "insurability" or explain what "evidence of insurability" would be satisfactory to Columbus Life.  *Black's Law Dictionary* (10th edition 2014) defines "evidence of insurability" to be "[i]nformation—such as medical records or medical examination—that an insurer may require to establish a potential insured's qualification for a particular insurance policy."  *Merriam-Webster's Unabridged Dictionary* online (2017) defines "insurability" as "the quality or state of being insurable[,]" and it defines "insurable" as "capable of being or proper to be insured against loss, damage, death" or "affording a sufficient ground for insurance."

Columbus Life relies on statutory law, case law, and legal treatises to support its position that the phrase "evidence of insurability satisfactory to [Columbus Life]" is not ambiguous. To begin, the phrase "evidence of insurability satisfactory to [the insurer]" is common in life insurance and required by statute in Ohio. Ohio law requires insurance policies to contain the following language:

> No policy of life insurance shall be issued or delivered in this state or be issued by a life insurance company organized under the laws of this state unless such policy contains:
>
> * * * *
>
> (J) *A provision that if, in the event of default in premium payments*, the value of the policy is applied to the purchase of other insurance, and if such insurance is in force and the original policy has not been surrendered to the company and canceled, *the policy may be reinstated within three years from such default, upon evidence of insurability satisfactory to the company* and payment of arrears of premiums with interest;

Ohio Rev. Code § 3915.05 (emphasis added). Likewise, treatises use similar phrases in their model life insurance policy reinstatement provisions. *See*, *e.g.*, 2-5 *The Law of Life and Health Insurance* § 5.16 (2016) (stating that a policy can be reinstated within five years subject to "receipt of evidence of insurability of the Insured satisfactory to the Company"); 29-179 *Appleman on Insurance Law & Practice Archive*, § 179.03 (2010) (stating a policy can be reinstated within five years upon "receipt of evidence of insurability of the Insured satisfactory to the Company"); C.W. Copeland, *McGill's Life Insurance* § 9.11 (10th Ed. 2015) (stating a policy can be reinstated within three years upon "evidence of insurability satisfactory to [the insurer]").

Additionally, an Ohio court of appeals has held that the term "evidence of insurability satisfactory to [the insurer]" is "plain, clear and unambiguous." *Stevens v. Nationwide Life Ins. Co.*, No. 62341, 1993 WL 120253, at *3–4 (Ohio App. 8th Dist. Apr. 15, 1993). Courts in other

jurisdictions also have held that the phrase "evidence of insurability satisfactory to the insurer" is not ambiguous. *See e.g.*, *Barber v. MetLife Grp., Inc.*, No. 10-CV-281, 2013 WL 173614, at *4 (N.D. Okla. Jan. 16, 2013) (stating in an ERISA case that the term "evidence of insurability" is unambiguous and requires the insured to submit "evidence of good health" ); *Dent v. Am. Int'l Life Assur. Co. of N.Y.*, 390 F. Supp. 2d 1341, 1344 (M.D. Ga. 2005) (finding that the "plain and ordinary reading" of the phrase "evidence of insurability" requires the presentment of medical evidence); *Myers v. Nat'l States Ins. Co.*, 606 S.E.2d 486, 489 (S.C. App. 2004) (stating in dicta that the phrase was not ambiguous); *Greenberg v. Continental Cas. Co.*, 75 P.2d 644 (Cal. App. 1938) (stating that the same phrase was not ambiguous, but finding that it meant more than "good health"); *Peters v. Colonial Life Ins. Co. of Am.*, 193 A. 460, 463 (Penn. Sup. 1937) (stating in dicta that the phrase was "sufficiently clear[,]" but not defining it).

EPM's arguments to the contrary are not compelling. EPM cites *Hogue v. Supreme Liberty Life Insurance Co.*, 59 Ohio App. 409, 18 N.E.2d 503, 508 (7th Dist. 1937), for the proposition that the insurer must reinstate a lapsed policy of insurance if the insured pays the premiums owed and meets all specified conditions for reinstatement. This proposition of law is not disputed. Columbus Life instead argues that EPM did not meet the requirements for reinstatement.

*Hogue* also contains an interesting discussion about the meaning of the phrase "evidence of insurability satisfactory to [the insurer]" that undercuts EPM's argument. The reinstatement provision in the *Hogue* policy required "production of evidence of insurability satisfactory to the company and approved at its home office" and stated that "reinstatement shall not take effect unless at the date thereof the insured is alive and in sound health." *Id.* at 505. The Ohio court of appeals concluded that the "sound health" clause was redundant of the "evidence of insurability

satisfactory to the company" clause. "It seems not a matter of doubt that the insured must be alive and in sound health in order that evidence of insurability could be produced, so the last sentence of the clause really adds nothing to the requirements for reinstatement." *Id.* at 508. There is no suggestion in *Hogue* that the phrase "insurability satisfactory to the company" was ambiguous.[4]

EPM also cites an Ohio court of appeals decision in which the court determined that a reinstatement requirement that an insured give the insurer "any facts [the insurer] needs to satisfy us that the insured is insurable for the contract" was ambiguous. *McKay v. Prudential Ins. Co. of Am.*, No. 59408, 1991 WL 251678, at *2 (Ohio App. 8th Dist. Nov. 27, 1991). Specifically, the *McKay* court determined that there was "ambiguity and lack of certainty as to the meaning of 'insurability[,]'" and the ambiguity had to be resolved in favor of the insured. *Id.* at *4. The appeals court reversed a trial court judgment in favor of the insurer because of the "ambiguity associated with the term insurable" and "whether good health is either synonymous with or a condition precedent to liability." *Id.* at *5. EPM concludes that the term "insurability" is ambiguous and that at least a question of fact exists whether it requires proof of good health.

---

[4] EPM suggests that the *Hogue* court found the phrase "sound health" to be ambiguous. This court disagrees with that reading of *Hogue*. The court stated that the sentence, "Such reinstatement shall not take effect unless at the date thereof the insured is alive and in sound health" might have ambiguity, but it is clear from the context that the potential ambiguity concerned the phrase "[s]uch reinstatement." *Id.* The court explained as follows:

> This language must be construed most favorably to the insured, since the company prepared the insurance contract, and so construed, the words 'Such reinstatement' can refer to no other than that which has been thereinbefore provided, that is, the reinstatement which results from the date upon which satisfactory evidence of insurability has been produced to the company and approved at its home office, and the arrears of premiums paid.

*Id.*

The persuasive value of the *McKay* decision is limited, however. This non-binding precedent has not been cited favorably in any other decision published officially or in the Westlaw database. It is in conflict with the later-issued *Stevens* decision, also from the Ohio Eighth District Court of Appeals, and the numerous decisions from other jurisdictions cited above. This Court declines to follow *McKay* and instead holds in conformity with the authorities cited above that "evidence of insurability satisfactory to [Columbus Life]" is not ambiguous.

The plain and common sense meaning of the phrase "evidence of insurance satisfactory to [Columbus Life]" requires an indication of the insured's relative good health and must be proven with medical evidence. *See Haemmerle*, 25 F. App'x at 363; *Smith v. Pacific Mut. Life Ins. Co.*, 192 F.2d 248, 251 (6th Cir. 1951). The court held in *Haemmerle* that the insured did not meet the conditions for reinstatement when the insured died before submitting to medical tests. 25 F. App'x at 363. In *Smith*, reinstatement was denied despite the fact that the insured claimed to be in good health because the insured did not present medical evidence. *Smith*, 192 F.2d at 251.[5] The phrase "satisfactory to [the insurer]" is interpreted using an objective standard

---

[5] The *Smith* court stated as follows:

> The reinstatement provision not only required the payment of the overdue premium, but also provided that the Company should be satisfied as to the insurability of the insured at the time of his application, and gave the Company the right to require the insured to submit evidence of insurability. The Company was not satisfied as to the insurability of the insured; it requested of the insured evidence of insurability; the insured failed to supply it although the Company provided him an opportunity to do so. On the question of insurability, it can not be reasonably contended that the Company was bound by the insured's own statement that he was in good health, particularly when, at the same time, he admitted having recently been under the care of a physician, without giving any details about the nature and length of the illness. The Company was fully justified in making a further investigation and, upon receiving the physician's report, which specifically stated that recovery was not complete, in requiring a physical examination. This condition precedent to reinstatement was never complied with.

*Id.*

such that the evidence must be satisfactory to a reasonable insurer. 29-179 *Appleman on Insurance Law & Practice Archive*, § 179.03 (2010).

Further, the meaning of the phrase "evidence of insurability satisfactory to [Columbus Life]" must be informed by the terms of specific policy which the insured is seeking to have reinstated. *Cf. Black's Law Dictionary* (10th ed. 2014) (defining "insurability" as information needed to establish qualification for a "particular policy"). The Reinstatement Application was an application to reinstate Policy CM5015628U insuring Harrison. (Doc. 24-1 at PageID 568, 692.) It was not an application for new life insurance policy. The Policy classified Harrison as having a mortality class rating of "standard (non-tobacco user)[,]" and required premium payments calculated based on that rating. Persons classified at a substandard mortality class rating must pay higher premiums to be insured.[6] To require Columbus Life to insure Harrison at a new mortality class rating would be to require Columbus Life to issue a new policy of insurance to Harrison under new terms with a new premium rate. Therefore, "evidence of insurability satisfactory to [Columbus Life]" cannot mean evidence that the reinstatement applicant is insurable at any mortality class rating as EPM argues.[7] It follows that the phrase

---

[6] Aaron Wolf testified as follows:

> The substandard ratings are graded on increments of 25 percent of extra mortality.

> So if someone is 50 percent higher risk than our standard class, they're given a rating class of table B or table 2 to indicate that they are 50 percent higher risk, and we charge a rate that is 50 percent higher cost of insurance. And that rating scale continues on up depending how much higher risk they are.

(Wolf Dep., Doc. 22 at PageID 135.)

[7] EPM's argument suffers from another flaw as well. Francis Moore, EPM's corporate representative, testified repeatedly at his deposition that he interpreted the phrase "evidence of insurability" to mean EPM's capacity to keep the insurance policy in place as the policyholder. (Doc. 24 at PageID 474, 505, 541.) EPM's argument to the Court, accordingly, is not supported by the testimony of its own key witness.

"evidence of insurability satisfactory to [Columbus Life]" in the Policy required Harrison to submit evidence satisfactory to Columbus Life that he was in sufficiently good health such that he was insurable at the same standard mortality class rating.

It is undisputed that EPM and Harrison did not submit evidence satisfactory to Columbus Life that Harrison was insurable at a standard mortality class rating when he applied for reinstatement. Setting aside the fact that Harrison failed to acknowledge any health conditions in the Reinstatement Application, Columbus Life determined in its subsequent investigation that Harrison did not qualify for a standard mortality class rating. Harrison not only retained the pacemaker, he also suffered from Parkinson's disease, dementia, peripheral vascular disease, and chronic kidney disease. EPM cites no evidence indicating that Harrison qualified for a standard mortality class rating. Rather, it argues that at least a genuine dispute existed whether Harrison was insurable at the substandard mortality class rating (as opposed to being uninsurable). (Doc. 26 at PageID 966–67 (relying on Doc. 22-1 at PageID 221).) Under the correct interpretation of the phrase "evidence of insurability satisfactory to [Columbus Life,]" whether Harrison was insurable at a substandard rating or was uninsurable is not material because the Policy authorized Columbus Life to deny reinstatement if he was not insurable at the standard mortality class rating.

In sum, no material facts are in dispute. EPM was required to submit evidence of Harrison's insurability satisfactory to Columbus Life to obtain reinstatement of the Policy. This Policy requirement was not ambiguous. It required EPM to submit medical evidence that Harrison was in approximately the same good health he was in at the time of the inception of the Policy—thus qualifying for a standard mortality class rating—so the Policy could be reinstated upon the same terms. In fact, Harrison's health had deteriorated from 2005 to 2012. At best, he

qualified for a substandard mortality class rating in 2012. Accordingly, the Court will grant

summary judgment to Columbus Life because it did not breach a contract nor act in bad faith

when it denied the Reinstatement Application.

## V.     CONCLUSION

For the foregoing reasons, Defendant's Motion to Exclude the Report and Testimony of

Richard Mintzer (Doc. 28), Motion to Strike the Errata Sheet (Doc. 29), and Motion for

Summary Judgment (Doc. 25) are **GRANTED**.

**IT IS SO ORDERED.**

Dated this 11th day of October, 2017.


BY THE COURT:


S/Susan J. Dlott_____
Susan J. Dlott
United States District Judge